# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| High Point, LLLP, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| THE UNITED STATES NATIONAL | * | |
| PARK SERVICE; JONATHAN B. | * | |
| JARVIS, in his official capacity as Director | * | CV 212-095 |
| of the United States National Park Service; | * | |
| STANLEY AUSTIN, in his official | * | |
| capacity as Regional Director, Southeast | * | |
| Regional Office, United States National | * | |
| Park Service; and GARY INGRAM, in his | * | |
| official capacity as Superintendent, | * | |
| Cumberland Island National Seashore, | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court are cross-motions for summary judgment and a motion for a status conference. See Dkt. Nos. 28, 36, 67. For the reasons stated below, High Point's Motions for Summary Judgment (Dkt. No. 28) and for a Status Conference (Dkt. No. 67) are **DENIED.** The Park Service's Cross Motion for Summary Judgment (Dkt. No. 36) is **GRANTED.**

### BACKGROUND

Most of the facts in this action are not in dispute. Cumberland Island, located approximately three miles from the

AO 72A
(Rev. 8/82)

mainland coastline of Georgia, is Georgia's southernmost and largest barrier island. Dkt. No. 12, ¶ 13. Currently, the Federal Government owns most of Cumberland Island in fee simple. Dkt. No. 12, ¶ 15. Cumberland Island remains largely undeveloped, although some areas are improved with houses, docks, and structures that are used by retained rights holders, Defendant National Park Service ("Park Service"), or visitors of the island. Dkt. No. 28, ¶ 4. Access to Cumberland Island remains limited; no roads connect the island to the mainland. Thus, all visitors must travel by boat or use an airstrip. The primary means of transportation to the island is by boat. Dkt. No. 36, ¶ 4. Historically, noted families such as the Carnegies and the Candlers owned large portions of Cumberland Island and used the island as a vacation spot.

Beginning in 1930, Charles Howard Candler, Sr. purchased several parcels of land on the northern end of Cumberland Island. Dkt. No. 2, ¶ 17. This area of Cumberland Island came to be known as High Point. High Point Compound, which consists of thirty-eight acres on the northern end of the island, has several residences and other structures that generations of the Candler Family have used and enjoyed. Dkt. No. 2, ¶¶ 17, 57. The Candler Family has historically traveled to High Point Compound through the use of Brick-Kiln Dock, a dock located on Hawkins Creek. The Carnegie Family formerly owned the land

AO 72A
(Rev. 8/82)

where Brick-Kiln Dock was located but allowed the Candler Family to build and use Brick-Kiln Dock for deep water access to High Point Compound. Dkt. No. 28, ¶ 18.

Even from the start, travel to High Point Compound has been a time-consuming and uncomfortable endeavor. To reach Brick-Kiln Dock from the mainland, members of the Candler Family traveled by road to Jekyll Harbor Marina on Jekyll Island, another barrier island. From there, they took a passenger vessel down Jekyll Creek, across the Jekyll and St. Andrew Sounds, down the Cumberland and Brickhill Rivers, and up Hawkins Creek. The distance from Jekyll Harbor Marina to Brick-Kiln Dock is approximately 11.8 miles. The boat ride from Jekyll Harbor Marina to Brick-Kiln Dock typically takes around forty-five minutes, depending on wave conditions in St. Andrew Sound. Dkt. No. 2, ¶ 24. High Point Compound is located roughly 3.5 miles from Brick-Kiln Dock. This distance must be traversed by either car or foot. Travel on foot takes approximately forty-five minutes, whereas travel by car takes fifteen to twenty minutes. Dkt. No. 2, ¶ 25. The roads from Brick-Kiln Dock to High Point Compound are narrow, unpaved, dirt roads that have many ruts and holes. Because of their condition, travel along these roads by car is described as slow, bumpy, and uncomfortable. Dkt. No. 2, ¶ 27.

AO 72A
(Rev. 8/82)

In the early 1970s, the Federal Government began acquiring land on Cumberland Island through the National Park Foundation, a non-profit charitable corporation, with the goal of establishing a national seashore. See, e.g., AR 0028-0036. A national seashore is a federal park located in a coastal area. Dkt. No. 28, ¶ 19. In 1972, Congress enacted legislation designating Cumberland Island a National Seashore. 16 U.S.C. §§ 459i-459i-9 (the "Seashore Act"). In 1973, the National Park Foundation conveyed the tract of land where the Brick-Kiln Dock was located to the Federal Government. Dkt. No. 36, ¶ 11; AR 0069-0073. In 1982, President Reagan signed legislation into law which, under the Wilderness Act, designated 8,840 acres of Cumberland Island as wilderness and 11,718 acres as potential wilderness. Pub. L. No. 97-250, 96 Stat. 709 (1982)("Wilderness Designation").

The Federal Government and Plaintiff High Point, LLLP's predecessor in interest began negotiations for the Federal Government to acquire lands owned by the Candler Family.[1] In 1982, High Point sold its property on Cumberland Island to the Federal Government but retained a life estate in High Point Compound. The conveyance specifically reserved certain rights.

---

[1] High Point, LLLP is a Georgia partnership comprised of members of the Candler Family and is organized to hold title and manage the Candler Family's interest on Cumberland Island. Dkt. No. 36 at 1. For purposes of this Order, High Point, LLLP and its predecessor in interest, High Point, Inc., are collectively referred to as "High Point."

AO 72A
(Rev. 8/82)

AR 0195-0206. The Warranty Deeds stated that the conveyance was:

> SUBJECT to the reservation of use by High Point, Inc., and its shareholders, of the area presently known as Brick-Kiln Dock located on Hawkins Creek in Tract N-5 Cumberland Island, Georgia, free from unreasonable interference by GRANTEE, its successors and assigns, with such use, nor shall GRANTEE, its successors and assigns, be responsible for maintenance, repair, or any liability for its use[.]

AR 0201. The Warranty Deeds further provided, in a section titled "Preservation," that:

> [a]fter the expiration of such period of four (4) years from the day of [the] conveyance, High Point, Inc., and its shareholders, shall not add to nor materially alter the character of existing improvements or structures contained within . . . areas where High Point, Inc., and its shareholders, reserve easements and rights of use and occupancy nor perform any new construction or change the topography of the land without first having obtained the permission in writing of the GRANTEE, its successors and assigns. Any building or structure damaged or destroyed by fire or other casualty or deteriorated by the elements, or wear and tear, may be maintained, repaired, renovated, remodeled, or reconstructed so long as the basic character of the building or structure is not materially altered, from that existing as of the date of expiration of such four (4) year period as specified above.

AR 0204-0205. The Warranty Deeds also contained the following language:

> Maintenance. With respect to . . . areas in which High Point, Inc., and its shareholders, reserve easements and rights of use and occupancy, High Point, Inc., and its shareholders, shall have the right to make normal

5

> maintenance and upkeep of the property, to make
> modern modifications to existing structures and
> outbuildings, to make repairs and reconstruction
> to comply with safety or other sanitation codes,
> to replace roofing or siding, to shore up
> structures threatened by subsidence of soil and
> to repair or replace utility lines.

AR 0205.

Over time, due to natural causes, the flow of water in

Hawkins Creek has changed, causing a buildup of silt in certain

areas and making the area of Hawkins Creek where Brick-Kiln Dock

is located too shallow for navigation by passenger vessels,

except for during a period of approximately four hours at high

tide. According to High Point, Hawkins Creek will eventually be

unusable as a point of deep water access to Cumberland Island at

all times, as the "silting-in" continues to increase. Dkt. No.

28, ¶¶ 58-60.

High Point, in response to this problem, requested

permission from the Park Service to relocate the dock. In a

series of correspondence between the Park Service and High Point

from 2008 to 2012, the Park Service has consistently denied High

Point's requests to either relocate the entire dock or just the

non-upland[2] portion of the dock. Dkt. No. 28, ¶¶ 61-91. The

parties agree that the Park Service has issued a final agency

---

[2] For the purposes of this Order, "non-upland" refers to marshlands,
tidelands, and riverbeds.

AO 72A
(Rev. 8/82)

action under the Administrative Procedure Act denying High Point's requests. Dkt. No. 28, ¶ 92.

High Point requested permission from the Park Service to pursue one of the following three options: (1) move the Brick-Kiln Dock approximately 300 feet to the north on Hawkins Creek ("Option One"), (2) move the Brick-Kiln Dock approximately 900 feet to the south on Brickhill River ("Option Two"), or (3) extend the Brick-Kiln Dock to the southwest, across Hawkins Creek and into the Brickhill River ("Option Three"). Dkt. No. 2, ¶ 81. The first two options would involve building a new dock in a different location than the existing Brick-Kiln Dock. See AR 0358-0359 (describing options). The third option would entail extending the dock from its current location to the southwest and into the Brickhill River by building an arched walkway of approximately 1000 feet to connect the non-upland portion of the dock to the existing upland portion of the dock. AR 0359. High Point maintains that each of the proposed options could be completed by moving or extending only the portion of the existing dock that is in the marshlands and keeping upland structures within their existing footprint. Dkt. No. 2, ¶ 95.

The Park Service reasoned that High Point's reserved rights under the Warranty Deeds did not include its present requests, and that, absent a reserved right, the Wilderness Act prohibited High Point's proposed actions. See Dkt. No. 28, ¶ 88. In its

7

requests, High Point argued that the non-upland areas were not owned by the Federal Government, but rather the State of Georgia retained ownership of them.  See, e.g., AR 0754-0755; AR 0903-0904.  Thus, High Point contended that the Park Service could not object to High Point's proposed options involving construction solely over the non-upland areas, because that land is not owned by the Federal Government.  Though contending that the United States has color of title over the marshlands and tidelands at issue, in its final correspondence, the Park Service stated, "the resolution of the marshlands ownership question raised in [High Point's] September 27, 2012 letter is not dispositive of the overall issue of whether the dock may be relocated."  AR 0945-0946.  The Park Service stated, "even assuming that somehow the marshlands were conclusively found to belong to the State of Georgia, and title formally returned to the state, [the Park Service] would still have regulatory authority over actions, such as dock construction, that occur in those marshlands."  AR 0946.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court must view the evidence and draw all inferences in the light most favorable

AO 72A
(Rev. 8/82)

to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). To discharge this burden, the movant must show the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. The burden then shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

When, as here, the parties have filed cross-motions for summary judgment, the applicable Rule 56 standard is not affected. See Gerling Global Reinsurance Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233-34 (11th Cir. 2001). "[T]he facts are viewed in the light most favorable to the non-moving party on each motion." Chavez v. Mercantil Commercebank, N.A., 701 F.3d 896, 899 (11th Cir. 2012). Additionally, "[t]he summary judgment procedure is particularly appropriate in cases in which the court is asked to review . . . a decision of a federal administrative agency." Fla. Fruit & Vegetable Ass'n v. Brock, 771 F.2d 1455, 1459 (11th Cir. 1985) (quotations omitted).

Under the Administrative Procedure Act ("APA"), a court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5

AO 72A
(Rev. 8/82)

U.S.C. § 706(2)(A). "[T]his standard is exceedingly deferential[.]" Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir. 1996).

> The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, [a court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal citations and quotations omitted).

## DISCUSSION

### I. Amount of Deference to the Park Service's Determinations

The parties disagree about the amount of deference that should be accorded to the Park Service's interpretation of the Warranty Deeds. Determining what rights are retained by High Point in the Warranty Deeds is a question of law regarding contract interpretation and is not a question that the Park

AO 72A
(Rev. 8/82)

Service would have a particular expertise in deciding. <u>Muratore</u> <u>v. U.S. Office of Pers. Mgmt.</u>, 222 F.3d 918, 923 (11th Cir. 2000) (affording deference to Office of Personnel Management's contract interpretation because of the agency's "relevant expertise in [the] area" and "because it negotiates the contracts at issue and . . . routinely interprets plans"); <u>Defenders of Wildlife v. Salazar</u>, 877 F. Supp. 2d 1271, 1291 (M.D. Fla. 2012) (declining to afford deference to Park Service's interpretation of a settlement agreement where the Park Service "[had] neither identified sufficient facts which give it special expertise . . . nor shown that its interpretation . . . [was] an administrative action with the effect of law."). Accordingly, the Court does not believe the Park Service's interpretation of the Warranty Deeds merits a heightened form of deference. <u>United States v. Mead Corp.</u>, 533 U.S. 218, 234 (2001) ("[A]n agency's interpretation may merit some deference whatever its form . . . .") (citing <u>Skidmore v.</u> <u>Swift & Co.</u>, 323 U.S. 134, 139-40 (1944)). Regardless of the level of deference, however, the Court concludes that the Park Service correctly interpreted the Warranty Deeds.

**II. Whether High Point Has a Reserved Right Under the Warranty Deeds to Relocate the Dock.**

The Wilderness Act is made subject to "existing private rights." 16 U.S.C. § 1133(c). Thus, if High Point has an

AO 72A
(Rev. 8/82)

existing private right to relocate the dock under the Warranty Deeds, then the Wilderness Act would not impact High Point's exercise of that right.

"When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002) (quoting Mobil Oil Exploration & Producing Se., Inc. v. United States, 530 U.S. 604, 607 (2000)). Both parties agree that Georgia law should guide the interpretation of the Warranty Deeds. See Dkt. No. 36 at 24.

"In construing the language of an express easement," such as the one at issue here, courts "apply the rules of contract construction." Parris Props., LLC v. Nichols, 700 S.E.2d 848, 853 (Ga. Ct. App. 2010) (citing Mun. Elec. Auth. of Ga. v. Gold-Arrow Farms, Inc., 625 S.E.2d 57, 61 (Ga. Ct. App. 2005)). "The cardinal rule of contract construction is to ascertain the parties' intent, and where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties." Id. (internal punctuation omitted). A court follows a three-step process in interpreting a contract. Global Ship Sys., LLC v. Cont'l Cas. Co., 663 S.E.2d 826, 828 (Ga. Ct. App. 2008). The first step is to determine if the language of the contract is clear and unambiguous. Id. "When a

AO 72A
(Rev. 8/82)

contract contains no ambiguity, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning." Id. (citations and quotations omitted). If the contract is unclear, the court seeks "to resolve the ambiguity by applying the rules of contract construction." Id.

Under Georgia law, "[a]mbiguity exists when a contract is uncertain of meaning, duplicitous, and indistinct, or when a word or phrase may be fairly understood in more than one way." Id. (citations and punctuation omitted). The words found in a contract "generally bear their usual and common meaning[,]" and those meanings may be obtained by reference to common dictionaries. Id. at 828-29 (citations omitted).

The plain language of the Warranty Deeds quite clearly indicates that High Point does not have the right to relocate the dock. The Warranty Deeds provide, in a section titled "Preservation," that:

> [a]fter the expiration of such period of four (4) years from the day of [the] conveyance, High Point, Inc., and its shareholders, shall not add to nor materially alter the character of existing improvements or structures contained within . . . areas where High Point, Inc., and its shareholders, reserve easements and rights of use and occupancy *nor perform any new construction or change the topography of the land without first having obtained the permission in writing* of the GRANTEE, its successors and assigns. Any building or structure damaged or destroyed by fire or other casualty or deteriorated by the

AO 72A
(Rev. 8/82)

elements, or wear and tear, may be *maintained, repaired, renovated, remodeled or reconstructed so long as the basic character of the building or structure is not materially altered,* from that existing as of the date of expiration of such four (4) year period as specified above.

AR 0204-0205 (emphasis added). The subsequent section of the Warranty Deeds is also relevant to the issue at hand.

> <u>Maintenance</u>. With respect to . . . areas in which High Point, Inc., and its shareholders, reserve easements and rights of use and occupancy, High Point, Inc., and its shareholders, shall have the right to make normal maintenance and upkeep of the property, to make modern modifications to existing structures and outbuildings, to make repairs and reconstruction to comply with safety or other sanitation codes, to replace roofing or siding, to shore up structures threatened by subsidence of soil and to repair or replace utility lines.

AR 0205.

High Point argues that the Warranty Deeds grant High Point the right to relocate the dock without the Park Service's approval based on the language providing that the dock "may be maintained, repaired, renovated, remodeled, or reconstructed so long as the basic character of the building or structure is not materially altered[.]" That clause of the contract notably does not include the word "relocate." High Point argues that omission is inconsequential.

The common meanings of the words contained in the Preservation Clause demonstrate to the Court that the Preservation Clause does not grant High Point the right to

AO 72A
(Rev. 8/82)

relocate the dock without the Park Service's permission.
Merriam Webster defines "maintain" as "to keep in an existing
state (as of repair, efficiency, or validity): preserve from
failure or decline[.]"[3] The definition of "repair" includes "to
restore by replacing a part or putting together what is torn or
broken" and "to restore to a sound or healthy state[.]"[4]
"Renovate" is defined as "to restore to a former better state
(as by cleaning, repairing or rebuilding)[.]"[5] "Remodel" means
"to alter the structure of: REMAKE[.]"[6] The relevant definition
of "reconstruct" is "to construct again" so as "to establish or
assemble again[.]"[7] None of those definitions encompasses
tearing down an existing structure in order to build a new
structure in a new location.

High Point identified <u>Calhoun, GA NG, LLC v. Century Bank</u>
<u>of Georgia</u> as support for the proposition that an easement may
include the right to relocate a structure, despite the absence
of the word "relocate" in the agreement. 740 S.E.2d 210 (Ga.
Ct. App. 2013). However, that case is readily distinguishable.

---

[3] <u>Maintain Definition</u>, Merriam-Webster Dictionary, <u>available at</u>
www.merriam-webster.com/dictionary/maintain. High Point makes
reference to several of these definitions in its own filings. Dkt.
No. 39 at 7-8.
[4] <u>Repair Definition</u>, Merriam-Webster Dictionary, <u>available at</u>
www.merriam-webster.com/dictionary/repair.
[5] <u>Renovate Definition</u>, Merriam-Webster Dictionary, <u>available at</u>
www.merriam-webster.com/dictionary/renovate.
[6] <u>Remodel Definition</u>, Merriam-Webster Dictionary, <u>available at</u>
www.merriam-webster.com/dictionary/remodel.
[7] <u>Reconstruct Definition</u>, Merriam-Webster Dictionary, <u>available at</u>
www.merriam-webster.com/dictionary/renovate.

AO 72A
(Rev. 8/82)

The language contained in the easement agreement in Calhoun was far more expansive. The easement agreement in Calhoun stated that the parties, subject to limitations contained in other portions of the agreement, would "*have the right to expand, alter, modify all or part of the buildings now or hereafter constructed on said tracts, or develop said tracts in any manner they see fit.*" 740 S.E.2d at 213 (emphasis in original). That broad language is readily distinguishable from the more limited options presented in the Warranty Deeds. Moreover, in Calhoun, the party who sought to move the easement was the owner of the servient estate rather than, as here, the dominant estate. Id. at 212 (citing Suntrust Bank v. Fletcher, 548 S.E.2d 630, 633-34 (Ga. Ct. App. 2001)) (stating the owner of a servient estate may relocate an easement if permitted in the instrument creating the easement as an exception to the general rule that an easement with a fixed location cannot be moved without consent of the owners of both estates).

Additionally, High Point's ability to maintain, repair, renovate, remodel, and reconstruct is expressly limited by the Warranty Deeds to actions that do not "materially alter[]" the "basic character" of the structure. "Basic" is defined by Merriam-Webster as "of, relating to, or forming the base or

essence: FUNDAMENTAL[.]"[8]  The relevant definition of "character"
is the "main or essential nature especially as strongly marked
and serving to distinguish[.]"[9]

High Point argues that it "has no intention of 'materially
altering' the main or essential nature of Brick-Kiln Dock"
because the new dock "will have the same basic components, be
constructed of the same or similar materials, and serve the same
purpose, which is non-commercial deep water access for the same
group of private rights holders."  Dkt. No. 39 at 8.  The Court
is not convinced by that argument.  High Point's statement
implies that the materials used in constructing the dock are
part of its "basic character," but the location is not.  Such an
argument is strained.  Location is clearly an aspect of a
structure's "basic character."  Almost any general description
of a building or structure would include its location.  All of
High Point's proposed options would alter the basic character of
Brick-Kiln Dock.

The Warranty Deeds also state that High Point cannot
"perform any new construction or change the topography of the
land without first having obtained the permission in writing" of
the Park Service.  AR 0205.  Merriam-Webster defines

---

[8] Basic Definition, Merriam-Webster Dictionary, available at
www.merriam-webster.com/dictionary/basic.
[9] Character Definition, Merriam-Webster Dictionary, available at
www.merriam-webster.com/dictionary/character.

"topography" as "the configuration of a surface including its relief and the position of its natural and man-made features[.]"[10] "The law favors a construction that will uphold the contract as a whole, and the entire contract should be read in arriving at the construction of any part." <u>Mon Ami Int'l, Inc. v. Gale</u>, 592 S.E.2d 83, 86 (Ga. Ct. App. 2003)(quoting <u>Atlanta Dev., Inc. v. Emerald Capital Invs., LLC</u>, 574 S.E.2d 585, 590 (Ga. Ct. App. 2002)). Building a dock in a new location farther up Hawkins Creek or on a different river, Brickhill River, would certainly change "the configuration of a surface" by changing "the position of its . . . man-made features." High Point's interpretation of the Warranty Deeds' language stating that High Point may maintain, repair, renovate, remodel or reconstruct the Brick-Kiln Dock so long as the basic character of the dock is not materially altered directly conflicts with the language requiring High Point to obtain written permission before changing the topography of the area. In sum, High Point does not have the reserved right to relocate the dock.

High Point's access to High Point Compound has not been cut off yet. At the present time, travelling to High Point Compound has been made less convenient and more difficult but is

---

[10] <u>Topography Definition</u>, Merriam-Webster Dictionary, <u>available at</u> www.merriam-webster.com/dictionary/topography.

AO 72A
(Rev. 8/82)

certainly not impossible. Thus, the Court is not confronted with a situation where High Point's ability to use and enjoy High Point Compound is eliminated. Under the current circumstances, the Warranty Deeds do not grant High Point the ability to pursue the three options High Point has proposed.

**III. Whether, in the Absence of a Reserved Right, the Wilderness Act Prohibits the Relocation of the Dock.**

The second part of the Park Service's reasoning was that, absent a reserved right in the Warranty Deeds, the Park Service was prohibited from authorizing the reconstruction of the dock at another location.  See AR 0735.

"Once federal land has been designated as wilderness, the Wilderness Act places severe restrictions on commercial activities, roads, motorized vehicles, motorized transport, and structures within the area, subject to very narrow exceptions and existing private rights."  Wilderness Watch v. Mainella, 375 F.3d 1085, 1089 (11th Cir. 2004).  In 16 U.S.C. § 1133(c), the Wilderness Act, in a section titled "Prohibition provisions: commercial enterprise, permanent or temporary roads, mechanical transports, and structures or installations; exceptions: area administration and personal health and safety emergencies[,]" states:

> Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no

19

permanent road within any wilderness area
designated by this chapter and, except as
necessary to meet minimum requirements for the
administration of the area for the purpose of
this chapter (including measures required in
emergencies involving the health and safety of
persons within the area), there shall be no
temporary road, no use of motor vehicles,
motorized equipment or motorboats, no landing of
aircraft, no other form of mechanical transport,
and no structure or installation within any such
area.

The Eleventh Circuit has described this language as a

"categorical" prohibition. <u>Mainella</u>, 375 F.3d at 1093; <u>see also</u>

<u>Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.</u>, 629 F.3d

1024, 1036 (9th Cir. 2010) ("The Wilderness Act prohibits the

development of any structure within a wilderness area, subject

to only one exception: 'except as necessary to meet minimum

requirements for the administration of the area for the purpose

of this chapter.'") (quoting 16 U.S.C. § 1133(c)).[11]

   As discussed above, the Park Service was correct to

conclude that High Point does not have an "existing private

right" to relocate the dock.   Thus, entirely new structures,

such as the new docks proposed in High Point's Options One and

Two, are prohibited under the Wilderness Act unless they would

---

[11] None of the "special provisions" set out in § 1133(d) apply.  The
only one arguably relevant is § 1133(d)(1), which states that
"[w]ithin wilderness areas designated by this chapter the use of
aircraft or motorboats where these uses have already become
established, may be permitted to continue subject to such
restrictions as the Secretary of Agriculture deems desirable."  That
provision mentions motorboat use but says nothing about structures
designed to enhance motorboat usage.

AO 72A
(Rev. 8/82)

be "necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." The construction of a new dock for private use clearly has nothing to do with the administration of the wilderness area. In the same vein, the construction would not be "necessary" for administration of the area. As a result, under any standard of review, the Park Service's conclusion that the Wilderness Act prohibited the relocation of the dock in the absence of an existing private right was correct.

## IV. Ownership of the Riverbeds and Marshlands

The foregoing analysis does not entirely dispose of High Point's proposed options. High Point asserts that the Federal Government does not own the riverbed and marshland areas because that land belongs to the State of Georgia absent a specific grant from the State. High Point contends that no such grant exists, and therefore the non-upland areas belong to the State. According to High Point, each of its proposed options could be completed by moving or extending only the portion of the dock that is in the marshlands and keeping upland structures within their existing footprint, which would seemingly be accomplished by connecting the existing upland portion of the dock to the new non-upland portion of the dock with a walkway. See Dkt. No. 2, ¶ 95; AR 0366.

AO 72A
(Rev. 8/82)

High Point submitted numerous documents to the Park Service to support its contention that the State owned the marshlands and the tidelands and asked the Park Service to reconsider its prior decisions. On December 12, 2012, the Park Service responded to this information and declined to change its earlier conclusions. See AR 0943. The Park Service agreed that High Point's September 27, 2012 letter and its supporting documentation tended to support High Point's contention that Georgia, and not the United States, owns the tidelands and marshlands around Hawkins Creek. AR 0945. The Park Service, however, also identified evidence it uncovered that suggested otherwise. Id. The Park Service concluded that "the issue of who owns the marshlands is still not clear-cut" but expressed that "for a number of reasons [it did] not believe that it [was] necessary to resolve this issue in order to make a determination on [High Point's] request to relocate Brick-Kiln Dock." Id.

First, the Park Service asserted that the United States at least had color of title over the marshlands and tidelands at issue. AR 0945. Second, the Park Service stated that, even if the State owned the marshlands and tidelands, the Park Service would still have regulatory authority and would still be required to deny the permit. AR 0946. The Park Service cited several sources of authority for this proposition. Under 36 C.F.R. § 1.2(a)(3), Park Service regulations apply to persons

22

entering, using, or visiting "[w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System . . . without regard to the ownership of submerged lands, tidelands, or lowlands[.]" Another Park Service regulation states that "[c]onstructing . . . [a] structure [or] boat dock . . . upon across, over, through, or under any park areas, except in accordance with the provisions of a valid permit, contract, or other written agreement with the United States, is prohibited." 36 C.F.R. § 5.7.

High Point, in its Motion for Summary Judgment, argues that only federally-owned land can be designated as wilderness or potential wilderness. Therefore, High Point concludes that the Park Service has no regulatory authority whatsoever over construction on non-federal land. High Point is not the first litigant to question the federal government's authority to regulate state or private interests within the boundaries of a national park. See Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv., 630 F.3d 431, 442 (5th Cir. 2011); State of Minnesota v. Block, 660 F.2d 1240, 1248-51 (8th Cir. 1981); United States v. Lindsey, 595 F.2d 5, 6 (9th Cir. 1979); United States v. Brown, 552 F.2d 817, 821-23 (8th Cir. 1977). Courts have repeatedly rejected such arguments.

AO 72A
(Rev. 8/82)

Congress, pursuant to the Property Clause of the United States Constitution, has authority to regulate conduct over nonfederal land encompassed within the boundaries of a national park in order to protect federal property. Brown, 552 F.2d at 822 ("[W]e view the congressional power over federal lands to include the authority to regulate activities on non-federal public waters in order to protect wildlife and visitors on the lands."); see also Kleppe v. New Mexico, 426 U.S. 529, 538-41 (1976) ("the power granted by the Property Clause is broad enough to reach beyond territorial limits.") (citing Camfield v. United States, 167 U.S. 518 (1897)(upholding federal regulation of fences built on private land adjoining public land)).

In the present case, Congress authorized the Park Service to regulate the lands comprising the Cumberland Island National Seashore and instructed that such lands be administered in accordance with the applicable provisions of the Wilderness Act. See Mainella, 375 F.3d at 1088 (citing Wilderness Designation § 2(c), 96 Stat. 709); see also 16 U.S.C. § 1133(b)("each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area"). Section 1133(c) of the Wilderness Act, as discussed above, prohibits structures or installations "within any such [wilderness] area." 16 U.S.C. § 1133(c).

AO 72A
(Rev. 8/82)

Here, the Wilderness Designation identified State-owned land as potential wilderness. See Dkt. No. 28, ¶ 54 ("Some of the lands referred to in the Wilderness Designation as 'potential wilderness,' notably marshlands and tidelands, were not at the time of the Wilderness Designation (and are not now) owned by the United States Government"); AR 0772 (legislative history stating that "[m]ost of the potential wilderness is intertidal area owned by the State of Georgia"). Policy statements and legislative history indicate that the Park Service is required to manage potential wilderness areas as wilderness to the extent possible. See AR 0765; AR 0772; Dkt. No. 28-1 at 90 (§ 6.3.1). Agencies may regulate private and non-federal lands within national parks in order to protect federal lands. See Brown, 552 F.2d at 822-23; Free Enter. Canoe Renters Ass'n of Mo. v. Watt, 711 F.2d 852, 856 (8th Cir. 1983) ("Given the recognized federal power to regulate nonfederal land, there is no reason to doubt the Park Service's interpretation of its own regulation, which is that it covers all the [national park] area, not just the portions that are federally owned."). Accordingly, the Park Service had the authority to deny a request for permission to construct on marshlands and tidelands designated as wilderness and potential wilderness areas and located within the Cumberland Island

AO 72A
(Rev. 8/82)

National Seashore, regardless of the ownership of the lands at issue.

The Court finds it noteworthy to separate two distinct issues regarding High Point's contentions and proposed options that would only involve changes over non-upland areas: whether the Park Service has authority to regulate the land in question and whether the Park Service has an affirmative obligation to consent to the proposed options in question. The record indicates that the State of Georgia will not authorize construction in marshlands owned by the State without consent of the upland owner. See Dkt. No. 28, ¶ 62. High Point identifies language in the Warranty Deeds which states that the Federal Government will not "unreasonably interfere" with High Point's use of Brick-Kiln Dock as the source of an affirmative obligation on the Park Service to consent to High Point's proposed options. Given the significant aesthetic impact these changes would have on wilderness areas, the Court cannot find that the Park Service's failure to consent to High Point's preferred options (even those that would only involve construction over non-upland areas) constitutes unreasonable interference. Thus, even disregarding the Park Service's regulatory authority over the lands at issue, the Park Service, as representative of the upland owner, cannot be forced to consent to a permit request under these circumstances.

AO 72A
(Rev. 8/82)

**V. Whether the Quiet Title Act Prohibits Adjudication of the Federal Government's Ownership of the Marshland.**

The Park Service contends that High Point cannot challenge the ownership of the marshlands and tidelands in this suit as a result of the Quiet Title Act. 28 U.S.C. § 2409a. The Park Service argues that the "Quiet Title Act provides an *exclusive* waiver of the United States' sovereign immunity for an adverse claimant to challenge the United States' title to real property" and "such a challenge will not lie under the APA." Dkt. No. 36 at 54 (emphasis in original) (citing Block v. North Dakota, 461 U.S. 273, 286 & n.22 (1983)).

As High Point noted, a recent United States Supreme Court case dealt with this issue. See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132 S. Ct. 2199 (2012). The Court determined that the Quiet Title Act only applies to "a particular type of action, known as a quiet title suit," which is "a suit by a plaintiff asserting a 'right, title, or interest' in real property that conflicts with a 'right, title, or interest' the United States claims." Id. at 2205 (quoting 28 U.S.C. § 2409a(d)). The Court found that the plaintiff's suit in Patchak was "*not* a quiet title action, because although it contest[ed] the Secretary's title, it [did] not claim any competing interest in the . . . Property." Id. at 2206 (emphasis in original). Similarly, the Quiet Title Act does not

AO 72A
(Rev. 8/82)

apply to High Point's suit because High Point, like the plaintiff in <u>Patchak</u>, is not an adverse claimant; it is not seeking to divest the United States of ownership to claim it for itself.  <u>See</u> <u>id.</u> (stating that "quiet title" is "universally understood to refer to suits in which a plaintiff not only challenges someone else's claim, but also asserts his own right to disputed property").  Accordingly, High Point is not barred from raising the ownership issue in the present suit; however, as discussed above, deciding who owns the marsh and tidelands at issue is not necessary for the resolution of this case.

## CONCLUSION

It is unfortunate that High Point and the Park Service have not yet resolved the situation caused by siltation in Hawkins Creek.  As demonstrated by the administrative record, High Point has consistently and conscientiously sought a mutually-acceptable solution.  It is also evident from the administrative record that High Point has been a good steward of the land. High Point's request is, given the circumstances, quite modest and understandable.  However, this Court, like the Park Service, is constrained by applicable law.

For the reasons stated above, High Point's Motion for Summary Judgment (Dkt. No. 28) and its Motion for a Status Conference (Dkt. No. 67) are **DENIED**.  The Park Service's Cross Motion for Summary Judgment (Dkt. No. 36) is **GRANTED**.  The Clerk

AO 72A
(Rev. 8/82)

of Court is directed to close the case and enter the appropriate
judgment.

    **SO ORDERED**, this 27TH day of February, 2015.

                          _____
                          LISA GODBEY WOOD, CHIEF JUDGE
                          UNITED STATES DISTRICT COURT
                          SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)